Appearance for the appellant, James Pappas, you are here, sir. And for the appellee, Jennifer Asher, you are here, sir. For our beginning counsel, I want to mention that the court requests counsel to be here a half hour early so that if we are running ahead, we can start, and you are here. So I want to thank you for doing that. It gives us an opportunity to get started in advance. So with that, Mr. Pappas, you may proceed. Thank you. Your honors, good afternoon. Good afternoon. While this case deals with financial issues between the parties, the most important issue before this court today is the trial court's rulings on supervised visitation and the entry of the plenary order against Mr. Mayes, which has seriously impacted his relationship as a father and a parent with his two young children. Basically, it was an emergency order of protection entered by the trial court on December 20, 2010. And after the entry of that emergency order of protection, Mr. Mayes had a visitation period that was ordered by the court on December 23, 2010 at my office, supervised by Petitioner's Counsel for Christmas holiday visitation. From that visitation from 12-23-10, there was no visitation that my client had with the minor children until he filed a motion on January 31, 2011 to establish a provider for visitation periods. From 1-31-2011 until the actual hearing date of March 9, 2011, Mr. Mayes had no visitation with his two young children. At that hearing, we had proposed, as a supervisor for visitation, Jane Dodson, who testified she would charge $20 per hour for the visitation periods. And she also corroborated the fact that since 12-23-2010, Mr. Mayes had no visitation with his children. It was a violation of the emergency order of protection by Mr. Mayes, and that was filed on January 24, 2011. And he did plead guilty, presented to negotiated plea on July 12, 2011 in reference to that violation of emergency order of protection. The violation itself did not have any violence attached to it. There was no contact with the petitioner or the children on that date. He did not attempt to enter into the residence. And when the police arrived, he was cooperative and polite with the police. He did not attempt to avoid arrest. And there was just no actual violence involved in that violation of the plea, though he did violate it. Then on March 24, 2011, the trial court granted a motion for supervised visitation. And that supervised visitation consisted of one day per week, commencing April 2, 2011. And most of these visitations took place in a public restaurant. So there was no visitation with his two very young children from December 24, 2010 until April 2, 2011. And from the entry of that temporary order, the trial court did not grant him any type of holiday visitation, no birthday visitation, no Father's Day visitation. Which, as a result of that, Mr. Mays had to file multiple pleadings with the trial court every time a holiday came up to attempt to get holiday visitation, or birthday visitation, or Father's Day visitation with his children. Mr. Mays testified to the trial court the hearings or the impact of the limited time in contact they had with his two young children. He had lost a previous strong relationship with his children as he had testified to the trial court that he had a substantial relationship with the children before the entry of the emergency order of protection. And then I ask you, how much of a threat was Mr. Mays to his children during this period of time? Mr. Mays was employed with the state of Illinois as a correctional officer for the last 16 years. He was also a tactical sergeant. He was a support officer. He was in the military as a police officer. That's the wrong question. The question is, could the trial court properly find that all the circumstances that supervised the visitation, limited in the fashion as it was, was appropriate? And we're supposed to review that. That's a discretionary call to the trial court, based on the evidence before it, that we can set aside only if it's unreasonable. Given the testimony of Dodson and the admission to violation of an order of protection, how can we so conclude? I don't think the limited amount of time, Your Honor, was reasonable and was fashioned by the trial court. One hour per week, I don't believe, is reasonable. Especially when you have two young children of this age, when at a point where they're trying to formulate their bonding with the father as a parent, one hour per week, Judge, is, I don't believe, reasonable. And further, Judge, the trial court never, in any of his orders, found a specific finding of serious endangerment to the minor children, mental, emotional, or mental health, in any of his orders. If you look at any of the orders in this file, there is never a specific finding of serious endangerment by the trial court, which a trial court has to find in order to restrict visitation. And it's not even in the judgment. And in fact, it wasn't in the plenary order. It wasn't in any temporary orders. And then the judgment that was entered by the trial court never made a finding of serious endangerment to restrict his visitation. In fact, the trial court did the complete opposite. The trial court recognized the fact that Mr. Mase needed to spend quality, co-parenting time with his children. That's what the judgment says. And the trial court then went on to indicate that the court did not want to create a case of parental alienation between the parties and the children. So there was never a specific finding of endangerment. But the court then kept the restricted visitation in effect. And he only increased it by a minimal amount after the entry of the judgment. Two more hours on Saturday and three hours on Wednesday. So instead of one hour a week, it went to five hours a week, split over two days, with the indication that if you get counseling and have ongoing sessions, that I'll review it in the coming months. That's right. Well, that sounds like an expansion of the previously ordered visitation. I understand that it's still restricted, but that goes in hand with him saying, I'm trying to do what I can. This is what I'm going to give you. This is what I want you to do. OK, and I agree. I mean, it wasn't a substantial expansion of time. But again, the trial court, again, even in the judgment, did make no provision for holiday visitation, no provision for summer vacation by Mr. Mays with his children. But there would have been holiday visitation after the review. Well, maybe there would have. I don't know. Well, I don't know either. That's not what we're, I mean, this is what we're going to do. This is what I expect you to do. This is when we're going to review it. That sounds like a very progressive approach to someone over who he has concern. Well, I understand that. But we're claiming that the restrictive supervised visitation without the finding of an endangerment in any of the orders was improper. But there's case law. It says you don't have to have a formalistic recitation of that. Well, I understand that. But also, but there's nothing in any of the orders that indicated that he was a serious endangerment to the children. Because, I mean, there's no even reference to that. And there was only one violation of the order of protection early on in the case. And there was no other violations. So when it got to the point of the plenary order of protection, there was no other violations except for one. And none of those, that violation did not involve any type of violence or threats to the petitioner or the children. So. Counsel, I would agree with that. But I'm just, I don't quite understand there was only one violation. Violations of orders of protection can be crimes. I understand. And if the violation is you're sitting in the backyard in the dark wrapped in a blanket, that's spooky. It is spooky. And I was a trial judge for a long time with a lot of family law cases. So I understand that people don't always act the same that they do normally. And that very nice people do things that seem outside the mainstream. But it is enough to give more than just a cause for concern to enter an OP and then have it violated. I understand. But that was done early in the case, Your Honor. And there was no progression of violations after that. That were either filed with the court or that was filed by the state's attorney's office. I think a lot could have been said that this happened early at the time of the separation of the parties. And he didn't have any visitation with his children for a substantial period of time. And the reasons that stated in my brief is why he went to the house. I don't agree with my client going to the house and doing that. But that's what he did. But there was no other progression of acts by him. But that's not required. I understand. And it's a question of, was there an abuse of discretion based upon all this evidence? How could we conclude that there was? Because of the finding, even though there doesn't have to be a specific finding of endangerment, there was nothing indicated in the orders where the children were in danger to restrict his visitation other than one violation of the order of protection. And that didn't involve the children at all, did it? Violation of the OP. He was just in the backyard. He was in the backyard, covered with a blanket. So I mean, there was no entry into the house. He wasn't knocking on the door. It was spooky, but it didn't really involve the children. Correct. Now, the second error we believe the court did was not modifying his child support order. That was originally. There's two aspects of this. First, I had a motion that vacate the temporary order, which the court did not do. And then there was the issue of the court not modifying the temporary order based on substantial change of circumstances. On the motion to vacate temporary order, a temporary order was entered on 12-15-2010 in child support of $925 per month for Mr. Mays to pay the $1,200 mortgage payment and gave temporary exclusive possession to the petitioner. He was represented by counsel in reference to that 12-15-10 hearing date. But before they went into court on that hearing, his counsel told him they got into somewhat of an argument, and his counsel told him that she was going to withdraw. And she went and told the court before the order was entered that she was going to withdraw. And there was no evidence or testimony or transcript taken of any of that child support hearing to determine any calculations made to the court. I mean, once she told her client that she was going to withdraw, and once she told the court she was going to withdraw, the court should not have entered any temporary order. It should allow, pursuant to Supreme Court Rule 13, my client to obtain new counsel within 21 days. That was never done. So then an agreed order is submitted by petitioner's counsel to the court. There was no agreed order. There was nothing signed by my client. My client did not acknowledge that order. So I mean, it was not an agreed order. But again, that order should never have been entered in the first place. Two days later, petitioner's counsel goes into court with a second agreed temporary order that basically dealt with reasonable visitation for my client. She has some language that the previous order entered by the court in reference to child support should stand. But again, that was never agreed to. And that order didn't state any type of child support. And then Mr. Mays filed a motion to vacate that on 12-21, 2010, seven days thereafter. And that was never vacated by the court. So again, I mean, just pursuant to Supreme Court Rule 13, that temporary order should never have been entered once those representations were made to the trial court. Well, what are we supposed to do about it now? We now have the permanent order, don't we? We have the permanent order now. OK, is it the permanent order what's at issue before us at this point? That's true, but part of the temporary order where the court ordered him to pay child support or rearage based on that original order, he heard all this stuff at the time of the final judgment. That's what he did. That's what the trial court did. That's what I'm saying. And on the basis of him not vacating that temporary order, he ordered child support or rearage. He ordered mortgage payment or rearages that were never heard in a timely manner. That goes to my second issue of the error of not modifying his child support order. He filed a petition to modify child support on 2-25-11, stating that he was being placed on disability with the state. His gross amount with the state in 2010 was $54,674. His army reserve was $9,846. So in 2010, he had earned $64,520 in gross income. In 2011, as a result of a serious spider bite when he was in the army reserve, he was placed on disability with the state. And it was unpaid disability. He was paid by the state up to September of 2011. And he had minimal income from his US Army Reserve. I think he only served two times in 2011, two monthly times. So his income through 9-15-2011 with the state was $29,790. And the army was $41,051. So the total amount through 2011 was $33,942, as opposed to the $64,000 in 2010. He made half the amount of money that he did in 2011, as opposed to in 2010. Now, if that's not a substantial change in the circumstances of the parties, I don't know what is. Substantial change is a reason to change a order of support. Temporary orders of support don't require substantial changes. When you're issuing a permanent order, trial court is entirely free to disregard temporary orders and decide what should be a permanent order. So the issue before us with regard to the order entered is, what should it be, or more specifically, regarding the permanent order of support that was entered? Was it reasonable? Yes, Your Honor. And I don't believe it was, because the trial court, again, heard all this at one time. And he had this evidence before him of his 2011 income. And obviously, there was a major difference between what he made in 2010 and what he made in 2011. And he refused to modify the child support order in any manner. I mean, he had two hospital stays in 2011. What should the child support order have been? My calculation was up through September of 2011, it should have been $771. Counsel, maybe I'm not being clear. We're reviewing the order entered, the judgment entered on child support order at the time of the final hearing. Right, I understand. What should that order have been? Should have been $771 per month through his income through September of 2011. That's what I believe it should have been. That would have been 28% of his net income that he had earned through September of 2011. And now, the child support order? The order, in effect, now is $995. That was the order from the hearing? Well, there was no hearing. That was the order that was initially entered by the trial court without any evidence or testimony when his former attorney withdrew. So the docket entry that this is by agreement of the parties and that both parties were present in person and by counsel is in error. They were present by parties with their counsel that day, but his attorney withdrew on the same day and walked out of court. The dates show granted leave to withdraw, and that several days later, the judgment order is presented and, I think, signed off on by both counsel. So she had not out yet. No, I'm sorry, Your Honor, it was not signed by counsel. The first order was not signed by counsel, and in fact, the agreed statement on the order was stricken by petitioner's counsel. So neither litigant signed any of the initial order for child support, and it was stricken. And the agreed amount was stricken, and there was no evidence testimony taken at that hearing initially. Was this presented to Judge Broad? No, the first initial temporary order was submitted to Judge Perrin, who was substituting for Judge Breau in that case. And then all the other matters that came in this case were heard by Judge Breau. So as a result, I mean, as a result of Judge Breau not reducing the child support based on the evidence and testimony, Mr. Mays incurred a substantial child support errorage. And then there was also evidence and testimony that there was being held in petitioner's trust account the sum of $800 that they had taken from a military garnishment that should not have been taken in the first place. That was presented to Judge Breau. And that was never given as a credit by Judge Breau to any outstanding child support errorage at the time of the entry of the judgment. Is it correct that on December 13, 2010, the trial court ended the temporary support order? It was entered. The amount of $965 per month? That was $925 per month on 12-15-2010. But that was the one where we indicated was not an agreed order. Well, doesn't the docket entries show that both parties appeared before the court with counsel at that time and that there was a child support was set by agreement of the parties? We're saying there was no agreement of the parties. My client was there. That's what they said. Counsel, listen to my question. My question was, what does the docket sheet say? That's what the docket sheet says. So the docket sheet showing that it was by agreement of the parties and that both parties appeared before the court with counsel was wrong? Well, these are just standard format orders, Judge,  No, I don't know any such thing, Counsel. Like Justice Connacht, I was a trial judge for 12 years. My docket entries were pretty serious matters. I know they were. And if I said, counsel are here with the parties and there's an agreed upon order, I did that and made that docket entry only when counsel appeared with the parties and there was an agreed upon order. Now, if I understand your position correctly, and I'm trying to wrestle with this, you're saying that this December 13, 2010 docket order isn't correct. That apparently some aspect of counsel appeared with the parties and I agreed upon order presented. Some aspect of that was not true. Well, it was not true because it wasn't an agreed order. My client did not agree to the order. He told his then attorney he did not agree to that order because that was the first time. So what part was it that the court was misled or the court misunderstood? I'm trying to figure out, you're telling me that the docket entry is not correct. Is that what your position is? And if it isn't, what part of it isn't correct? Your Honor, I wasn't there for that docket entry. Well, OK. I can't tell you what happened. All I can tell you is what my client told me. He was not in agreement with the child support. Well, counsel, how can we accept your client's representation and disregard the docket entry? Because what occurred after that, Your Honor, she struck the agreed portion of the agreed order. This agreed order was prepared by petitioner's counsels two days before the hearing. And then when he got to the hearing and when his attorney withdrew at the time of the hearing, she marked off agreed order. Now, if he had agreed to this order, there was two signature lines for both parties to sign, you would think that she would have had her client sign and approve it, like it's done in almost every case in Sagamon County that I'm aware of. I've been doing this for 35 years. He didn't sign off on that temporary order. She didn't sign off on that temporary order. And then there's a strike in an agreed order. The docket entry is wrong? Actually, we're talking about two or three different docket entries. My notes show that there was an appearance on December 13. That's when the agreed order was, I mean, judge was told that this amount was set by agreement of the parties. Two days later, they come back, reestablish the same amount, give her exclusive possession, give her temporary custody. And that's when counsel said, I'm going to withdraw. And then two days after that, the parties show up with a signed agreed temporary order to the trial court, which contained everything that was in the December 15 order. And the December 15 order originated with the December 13 appearance, where it's represented to the court, whether properly or not, it apparently was represented to the court that it was an agreed order. I don't think it was properly represented to the court that it was an agreed order, Your Honor, because my client didn't agree to it. He didn't sign off on it. And the third order only dealt mostly with liberal visitation that the parties had agreed to after that when he was pro se. You'll tie these up, counsel. You have an opportunity to address this again in rebuttal. All right. OK, Ms. Asher. I please support counsel. My name's Jennifer Asher, and I represent the petitioner, Sarah Mays. I'd first like to address a few of the issues raised by Justice Connect and Justice Appleton with respect to the visitation. I believe that Judge Breaux was extremely progressive with respect to the visitation that was issued to Mr. Mays. And Justice Appleton, you asked whether or not this involved the children. I think you stated that it didn't involve the children. And I would propose to you that it did involve the children with respect that they were there. They were there in the home sleeping. He knew they were there in the home with their mother sleeping. And he's parked in a blanket, sleeping bag, belt off, hat, and a snow drift underneath the window where they're sleeping. So did it involve him touching the children and hitting the children? No. But it involved the children in the sense that there's an emergency order of protection in place, and he goes to the place where the children are. What did the emergency order of protection say? What was he prohibited from doing? He was prohibited any kind. He was not granted any visitation, and he was prohibited any contact with Ms. Mays or the children, prohibited from going to school. And the emergency order of protection was based upon some statements the party's child had made to the teacher. Well, I'm going to back up just a little bit. Just to set, on December 13th, Justice Connect is right. The first order entered with respect to child support. And that was an agreement between Ms. Williams and I for the $9.65 a month. We did not have an agreement with respect to visitation, exclusive possession, mortgage payments, all the other issues that go along with a dissolution starting. So that's why Judge Grove set a hearing then on the 15th. The 15th is when the temporary order, Judge Perrin-Kostoff agreed, but the temporary order issues with respect to visitation. And Mr. Mays was granted visitation on the 15th of Sunday and Monday, I think from noon to 7, no overnights, but visitation periods with the children. It was then on December 20th that we filed for the emergency order of protection. So there was very limited visitation that he had with the children prior to the request for the entry of an emergency order of protection. And it was the circumstances that happened during those visitation periods that led us to seek an emergency order of protection. And those included threats made to the children, the statements that the children made to the counselor and to their teacher about being scared about their dad. And that is what led to the issuance of the emergency order of protection. How old are the children? Currently now, they are 10 and 5. Did the information you're referring to now, was that also presented during the hearing on the substantive issue? Yes. And I tried to go back and count the number of times that we were in court on this matter. And quite simply, I couldn't ascertain that number. You know, the family law rules, I think, are helpful in cases like this, where Judge Groh did have this case, but for a few days in the middle of December due to a family emergency, from December 13, 2010, all the way through November of 11. He heard the hearing on the emergency order of protection. He heard all the testimony with regard to that. He heard all the testimony every single time that a motion was filed for a supervised visitation, that a motion was filed for Easter visitation. Judge Groh had all of that evidence in front of him. So yes, not only did he hear the evidence on the emergency order of protection, he heard the evidence as it existed, which really are part and parcel as the visitation issues that arose out of the dissolution. Well, what I was really asking, though, was that evidence resubmitted? Not was it present in the case, but was that part of the decision on custody and visitation? I would submit to you that it was part of that. Because he was thinking about it, or because it was re-argued and presented to him either in a new way or the same way? There are no objections in the appellate court, counsel. I'm asking a question about the record. And I will review the record to determine whether I'm asking a question about, I understand it's part of the case, or arguably part of the case. I'm asking if testimony in that regard was presented during the custody visitation hearing. The final custody visitation hearing. I would submit that it was. If I went back and looked at the exhibits, it would be included in the exhibits. You mean like a report or the OP itself? For instance, an example that comes to my mind is the pictures of the fence, the pictures of the jeep. Those are a part of the record. Anytime I went. I know, but I'm talking about the statements made to counselors or other witnesses other than Dodson. Did any other witnesses testify? Those witnesses testified in, we had so many days of hearing. But yes, those counselors did testify. And I'm trying to recall when that would have been. But I can remember meeting with Ms. Boatman. And I can't recall the teacher's name. But yes, that evidence was submitted. I believe it would have probably been in early 11. So did they come back at the final days of trial in 2011? No, they didn't come back. But that evidence was submitted over the course of the days. And I think that the next issue that I would like to address is there is ample evidence that supports a finding of serious endangerment by Judge Breaux. Well, there may be ample evidence, but he didn't make the finding. It was not a formalistic. The formalistic requirement was not met. Well, how about a medium? How about somewhere in between? I think that can be found in his reliance of the issuance of a plenary order of protection. And he specifically makes that finding in his judgment, in his memorandum of opinion, along with the specific finding that the order of protection was violated and pled guilty to. So I would say. Did you trial counsel? I did trial, yes. Did you mention to the judge that he needs to make that finding? Um, I, no, I don't believe I did. I, in my closing argument, I don't think it was in my closing argument. Again, at the time, at the final time of trial, the plenary order of protection had already entered. And section 219 of the Illinois Domestic Violence Act, excuse me, 214b7, doesn't require the strict requirements of section 607.1 of the Illinois Marriage and Dissolution of Marriage Act. So no, I didn't. But again, we are operating with the understanding that the plenary order of protection had already been issued at the final time of trial. I had asked about the December entry, the matter, the docket entry, which appears on December 13. I'd asked Mr. Pampas about that. And I want you to note that the docket entry shows both parties appeared before the court with counsel. And the docket entry says the child support was set by agreement of parties. That's accurate. And it was subsequent to that that, who was counsel for the respondent at that time, by the way? Attorney Amy Williams. Amy Williams? Yes. So subsequent to that hearing, she withdrew? Yes, so that was set on the 13th of December, 2010. And then a temporary hearing was set on the 15th with Judge Brough. He was out due to a family emergency. So Judge Parent and Ms. Williams and I had worked out many of the issues that remained with respect to the temporary issues. And that's why I had prepared an agreed temporary order. And so we were presenting the remaining issues that were not agreed upon to Judge Parent. He crossed off the word agreed, and he entered the temporary order on December 15, two days later. What wasn't agreed in the proposed order? The main issue was with respect to exclusive possession. Mr. Mays didn't want to have to. And if you read his testimony, he didn't think he could move out as quickly as his counsel at the time was suggesting that he should move out. OK, when was the first time it was presented to you and to the court that there was an issue regarding the child support? There was a motion to vacate the temporary order filed on December 21, 2010. And in the February filing of the motion to abate or reduce child support. But I would submit to this court that Judge Brough had the authority, any trial court judge has the authority to go back to the date of filing. So even if he had vacated that temporary order, or even if Mr. Pappas had noticed up his petition to reduce child support, which never happened, Judge Brough still has the ability to go back and make a finding that Mr. Mays should have made those mortgage payments, even if it wasn't ordered on December 15, 2010, because a petition for dissolution was filed on December 13th, or excuse me, December 8th. So he could have ordered him to pay the mortgage payments all the way back to December 8th. Now, you say you attended lots of different hearings over a period of 2011? Yes. You were served with the motion to vacate the temporary order on December 15 that was filed December 21? Yes. Why didn't the judge rule on it? I don't know that it was ever. And I don't know if it was ever noticed up. It was. You mean all these multiple hearings that, at that point, was Mr. Pappas now counsel? Yes. Because the child support. He asked, or you asked. Again, I'm going back to my time as a trial judge. I've got a motion here. I've entered a temporary order, and I motioned to vacate it. One of two things can happen. I guess maybe one of three. Deny it, grant it, or grant it in part and deny it in part. But something should happen on it. Did Mr. Pappas or you call to the judge's attention, by the way, judge, we've got this motion here, and we've got to address it. I did not call it to the judge's attention. My client was in need of child support, which the order at the time required. The visitation portions of the order had been dealt with with respect to the emergency order protection that was filed. Exclusive possession, my client was in the house. So no, I did not call it to the court's attention. But these are all temporary issues that had to be dealt with in one fashion or another. And I think a review of Mr. Pappas' brief reveals that actually based on the 2010 income, Mr. Mays' child support should have been $1,107 a month. So when we calculated at the end of 2010, it was actually low. So I mean, perhaps I should have called it up to vacate it. But the bottom line was my client was receiving child support an amount consistent with statutory guidelines. And visitation was being addressed pursuant to the emergency order protection. And she had exclusive possession of the home. And again, I would submit that Judge Breaux even had it been vacated, he still has the ability to go retroactive to the data filing of the petition of dissolution, order child support, order mortgage payments to be made. So his issuance of the judgment with respect to mortgage arrearage and child support arrearage could still have arisen even had this order been vacated. You heard Mr. Pappas argue that the judge was mistaken with regard to the child support which was ultimately entered in this case. Why isn't he right? He's not correct because there was no solid evidence presented that Mr. Mays was not receiving income. We presented his W-2s, his pay stubs, and testimony of Mr. Mays with respect to his income. The court relied on the 2000, I think we had income history back from 2008, 2009, 2010, and year-to-date 2011. That's what the court utilized when setting the amount of child support. And there were three months that Mr. Mays testified in 2011 that he didn't earn income. I think it's easy for the trial court to have made the assumption that he was going to continue to work. The military was, or be paid by the military, the military was providing medical care for him in Kentucky. The military was continuing to provide health insurance for the entire family at the time of dissolution. And it's at the very last day of trial that he says, oh, by the way, I'm not going to be paid any longer. When the arrears is calculated, the trial court can ascertain that child support continues to be withheld pursuant to the notice of withholding. In fact, I sent a notice of withholding on September 13, 2011, and child support continued to be withheld. There's never been a lapse of child support withheld. So I would submit to you that there wasn't enough evidence to submit that he wasn't being paid. And the trial court utilized the income history of Mr. Mays when establishing child support at a rate of $965. Again, low for the figures of 2010, and accurate if the support continues for 2011, 2012. With respect to the division of the marital estate, the marital assets and the marital debts, Mr. Pappas' brief requests that this court find it was an error for Mr. Mays not to be awarded any equity in the marital residence. And you can't just take one asset out of the equation and say, OK, you should have been awarded equity in this marital residence, but I'm not going to take any debt to offset that equity. I'm not going to do any other adjustments to the balance sheet. And in fact, if you were awarded half the equity contained in the residence, the balance sheet would result in Mr. Mays receiving a negative net worth. These parties have more debt than they do assets. Mr. Mays receiving only a negative 20% of the marital estate, and Ms. Mays receiving a negative 80%, which I submit to you would be an error. So the court did not abuse its discretion in the division of marital assets and debts as presented in the judgment of dissolution of marriage. And I would submit that you can't pull just one asset out and ask for equity in just that one asset without considering the division of all of the assets and all of the debts. And same with respect to the SERS pension, Mr. Pappas argues that the valuation placed on that pension was inaccurate. But we stipulated and agreed that that pension was going to be divided evenly between the parties. The court did that value was not utilized in the balance sheet that divided the assets and the debts. Was the quadro entered? I don't know the answer to that. I was just thinking, I think the quadro probably has not been entered given the appeal. But I don't know whether or not the quadro has been entered yet. But I would submit that it probably has not yet been entered. But that was what we stipulated would happen. There was some discussion about the supervised visitation. That was changed, so there's more of it now than there was earlier, is that correct? That is accurate. And so where do things stand at the moment? What did the court say, that this was going to be under further review? It was going to be under further review. There is now, at the moment, another pending violation of the order of protection. Another charge with respect to that. So there has been continuances with respect to the court's review of the supervised visitation as it currently stands. And finally, with respect to the dissipation, the dissipation was a proper finding by Judge Breaux. In early 2011, in February of 2011, I sent correspondence to Mr. Pappas inquiring as to how the parties wanted to file their 2010 taxes. I proposed that they file jointly. Never heard back from that correspondence. Instructed my client not to file at the time. Went through the discovery process and ascertained that Mr. Pappas had filed his taxes and had filed jointly, claiming that my client was homemaker. Claimed both children as exemptions and received a $6,000 tax refund. And at that point, once we've asserted that that was dissipation, those funds no longer existed at the time of trial. When we got those funds back in November of 2011, those funds were gone. Mr. Mays did not show by clear and convincing evidence that those funds were used for marital purpose. He indicated he paid a cell phone bill of $200, a dental bill of $158, and paid some marital bills. But the trial court properly found that he did not meet his burden of evidencing that those funds were properly used for marital purposes. And part of Mr. Pappas' brief submits that the court used the entire $6,000 figure, opposed to take out the amount utilized for the tax preparation, and also gave a credit for dissipation based on the amount, $209, that my client had to pay for federal and state taxes because she was unable to claim the children at that point. And I don't think that was improper for the trial court. At the time the party separated in December of 2010, Mr. Mays testified that he removed $3,000 from the party's joint account. My client removed $375 and $300 on another occasion. So the suggestion that the award of $6,018 as a dissipation is not improper. And quite frankly, I think the dissipation award should have been more, but the trial court found it to be $6,018 and it was not an abuse of discretion with respect to the charge of dissipation. Thank you. OK, thank you, counsel. Mr. Pappas, any rebuttal, sir? Your Honor, I think it's appropriate for counsel to bring up an alleged violation of the OP after the entry of the judge for dissolution of measures, not before this court. You're correct that it's, I think, responsive to a question I answered, but it's not something that we will consider in any way because charges are just that. Justice Connick, in reference to your question to counsel, there was no resubmission of any of the testimony at the final hearing in this matter. And all of the testimony that Ms. Asher had indicated was early on in the case after the entry of the emergency order of protection. Justice Steigman, in reference to your question about the child support calculations, there's nothing in Judge Grove's judgment that indicated Judge Grove used 2008, 2007, and 2009 for calculation of child support. The court had before it, at the time of the final hearing, what Mr. Mays made in 2010 and what he made in 2011. And that was submitted by exhibits. Wasn't there this other evidence as well introduced? Wasn't this other evidence introduced into the record? Not, well, there was tax returns submitted, but there was no indication in Judge Grove's judgment that he relied on any previous tax returns to calculate his child support arrearage. The court isn't obligated to comment on all the evidence it has considered in reaching its judgment if that evidence is in the record. That was my question. Was it there? It was in the record, Your Honor. But Mr. Mays specifically testified to the court of all the problems that he had incurred in 2011 as a result of that spider bite. He wasn't working. He wasn't receiving any money from the Army or the state of Illinois as of September of 2011. So how could he continue to pay $995, whatever the court previously entered, when he had no income to do so? In reference to, we thought it was an error for the trial court to award marital residence to the petition. That's what we appealed on. On a number of issues, Your Honor. What we appealed on was the fact that her client came into court and indicated that because of her credit, she was not able to refinance marital residence and had made no attempt at all to refinance marital residence at any time during this litigation. The trial court had that testimony before. She couldn't refinance it. She didn't have the income to refinance it. She made no attempt. Mr. Mace had indicated to the trial court that because he was a veteran, he was able to refinance the marital residence through the Veterans Administration and get it done. And that was what we appealed on. Now, the petitioner had placed a value of a pension in her argument, which the court accepted when it went through the argument when it made its division of personal property. And she indicated that his pension was valued at $146,000. And she referenced an exhibit before the trial court. There was no Exhibit 23B before the trial court in reference to the valuation of the pension. So we don't know if the trial court took into account the value of that pension when it came to dividing all the assets and property of the parties. And here we had $11,000 of equity in the marital residence. And my client gets zero. He gets nothing. And then in his order, if she can't refinance it and he has a first right of refusal, he has to pay the total amount of $168,000 to her. And it has no equity in it. And then he makes him pay for past due mortgage payments of close to $15,000. In reference to the dissipation issue, my client said he accidentally filed the 2010 as before they had filed joint tax returns before that. He had made a mistake. He was going to file an amended order. He indicated to the trial court what he had spent as contained in my brief what he did. So we believe it was error for the court to file dissipation on his behalf. OK, thank you, counsel. We'll take this matter under advisement and be in recess until two weeks.